Nicole Lavallee (SBN 165755)
Daniel E. Barenbaum (SBN 209261)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        dbarenbaum@bermantabacco.com

Leslie R. Stern (*pro hac vice* to be submitted)
Nathaniel L. Orenstein (*pro hac vice* to be submitted)
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: lstern@bermantabacco.com
        norenstein@bermantabacco.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, derivatively on behalf of PG&E CORPORATION, | Case No. _____ |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| LEWIS CHEW, ANTHONY F. EARLEY, JR., FRED J. FOWLER, RICHARD C. KELLY, ROGER H. KIMMEL, RICHARD A. MESERVE, ERIC D. MULLINS, FORREST E. MILLER, ROSENDO G. PARRA, BARBARA L. RAMBO, ANNE SHEN SMITH, JASON P. WELLS, PATRICK M. HOGAN, and GEISHA J. WILLIAMS, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| PG&E CORPORATION, | |
| Nominal Defendant. | |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Shareholder Oklahoma Firefighters Pension and Retirement System ("Plaintiff" or "Shareholder"), by its undersigned attorneys, derivatively and on behalf of Nominal Defendant PG&E Corporation ("PG&E" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants for breaches of fiduciary duty owed to the Company and for violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Shareholder makes the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on the investigation conducted by its attorneys. This investigation included, among other things, a review of documents produced by PG&E in response to Plaintiff's books and records demand; the Company's conference calls, announcements and press releases; filings made by the Company with the U.S. Securities & Exchange Commission ("SEC") and other regulatory agencies; corporate governance documents available on the Company's website; governmental and regulatory investigations of the Company and documents relating thereto; and news reports about the Company.

## NATURE OF THE ACTION

1. This is a derivative action brought by Plaintiff on behalf of Nominal Defendant PG&E against certain directors and certain senior officers of the Company[1] (identified herein) for abdicating their fiduciary duties to oversee the Company's safety and risk functions. Specifically, the Board failed to ensure that PG&E's electrical power and distribution lines complied with state regulations and other safety protocols designed to prevent power and distribution lines from sparking wildfires in California. This lack of oversight caused a series of catastrophic wildfires that ravaged areas of Northern California beginning in October 2017 (the "Northern California Fires").

---

[1] The non-officer members of the Boards of Directors of PG&E and its wholly-owned subsidiary Pacific Gas & Electric Company ("Pacific Gas and Electric" or the "Utility") are identical, as are the two entities' Audit Committees and Safety and Nuclear Oversight Committees. For simplicity's sake, references to "PG&E" shall mean, unless otherwise noted, both PG&E and the Utility, and references to the Board of Directors or Board Committees of "PG&E" shall mean, unless otherwise noted, the Boards of Directors (or "Board") or Board Committees of both PG&E and the Utility.

2.      "This is truly one of the greatest, if not the greatest, tragedy that California has ever faced," said California Governor Jerry Brown of these wildfires.[2]

3.      Governor Brown's remarks underscored the extent of damage caused by the Northern California Fires, which destroyed thousands of homes and left many more thousands of people homeless and at least 44 people dead.  Over 100,000 people were evacuated or had no homes to return to more than a week after the fires first started.[3]

4.      The sheer size of the burn sites is unfathomable.  More than 380 square miles burned in the area just north of San Francisco.  That is one-third the size of Rhode Island, and almost 20 times larger than its capital, Providence.  The fires were more than 2.5 times larger than San Francisco and Sacramento combined, and 17 times larger than the island of Manhattan.

5.      The Northern California Fires took months to contain. In all, 11,000 firefighters fought the blaze, including several thousand inmate volunteers from the California Department of Corrections and Rehabilitation.  These firefighters and inmates worked around the clock.

6.      The cost of the Northern California Fires has proven to be enormous.  In addition to the human toll, at least two dozen wineries in Napa, Sonoma, and Mendocino counties have been partly or fully destroyed—having prolonged and deleterious effects on California's multi-billion-dollar wine industry and overall economic health.  In addition, the Northern California Fires are predicted to cost the U.S. economy at least $85 billion in the form of lost jobs and lost taxes.[4]

7.      In the aftermath of these devastating wildfires, a disturbing fact became clear: ███████████████████████████████  Indeed, as made clear by an

---

[2] Kevin McCallum, Gov. Brown in Santa Rosa: Fires a Horror No One Could Have Imagined, The Press Democrat (Oct. 14, 2017), http://www.pressdemocrat.com/news/7525290-181/gov-jerry-brown-us-senators.

[3] Bill Gabbert, Northern California Fires – Hot and Dry Conditions Monday, But Decreasing Winds, Wildfire Today (Oct. 16, 2017), http://wildfiretoday.com/2017/10/16/northern-california-fires-hot-and-dry-conditions-monday-but-decreasing-winds.

[4] Brian Lada, Devastating California Wildfires Predicted to Cost U.S. Economy $85 Billion; Containment May Take Weeks, AccuWeather (Oct. 15, 2017), https://www.accuweather.com/en/weather-news/devastating-california-wildfires-predicted-to-cost-us-economy-85-billion-containment-may-take-weeks/70003000.

1  investigation conducted by the California Department of Forestry and Fire Protection ("CAL

2  FIRE") ████████████████████████████████████████████████

3  ████████████████████████████████████████████

4  ██████████    The Company had experienced a series of disasters followed by investigations and

5  criminal and civil legal actions, the end result of which consisted of regulatory reports, criminal

6  convictions, and settlements and judicial orders all mandating action.  Nonetheless, ██████████

7  ████████████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ██████████████████████████████████████████████

10  ████████████████    All told, ████████████████████████████

11  ████████████████████████████████████████████████████

12  ██████████████████████████

13    8.    Since the Northern California Fires, an investigation by CAL FIRE determined

14  that at least twelve of the wildfires were caused by PG&E's electric power and distribution lines

15  and conductors, as well as the failure of the power poles themselves.  More specifically, these

16  fires were caused by, among other things, the Company's downed power lines coming into

17  contact with vegetation and/or trees and branches.

18    9.    In addition, CAL FIRE found that, in at least three instances, PG&E had failed to

19  remove trees and vegetation from the proximity of a power line, in violation of the state Public

20  Resources Code section 4293.[5]  CAL FIRE referred these violations to the appropriate county

21  District Attorneys' offices for possible criminal prosecution

---

[5] California Public Resources Code section 4293 states, in relevant part, that:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current….

10.     This is not the first time that PG&E's disregard for safety has resulted in disaster. In 2015, CAL FIRE found PG&E at fault for a fire in Butte County, California, that killed two people and destroyed nearly 1,000 structures (the "Butte Fire").  The Company was also responsible and criminally convicted for a September 2010 pipeline explosion in San Bruno, California, which ignited a massive residential fire that killed eight people ("San Bruno Explosion").

11.     As demonstrated by the Company's abysmal safety record, government investigations and reports, criminal convictions, and ████████████, the Defendants have systematically and repeatedly failed in their fiduciary obligations to ensure that PG&E delivers its services safely.  Their failure has directly harmed PG&E by exposing the Company to billions of dollars of liability and expenses.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this action under Article III of the United States Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder, over which the Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Shareholder is a citizen of Oklahoma and PG&E is a California corporation that has its principal place of business in the State of California.  The Director Defendants in this action are believed to reside outside the State of Oklahoma.  The amount in controversy is unknown but believed to exceed $75,000; PG&E has acknowledged that it is facing at a minimum $2.5 billion in losses for certain of the Northern California Fires (excluding others as well as penalties and fines).[6]

14.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

---

[6] PG&E's Form 8-K at 3 (June 21, 2018).

15.     Personal jurisdiction exists over each Defendant either because each of the Defendants conducts business in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendants by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District as well because: (i) the conduct at issue took place and had an effect in this District; (ii) PG&E maintains its principal place of business in this District and each of the Defendants either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the wrongs complained of herein occurred in this District; (iv) most of the relevant documents pertaining to Shareholder's claims are stored (electronically and otherwise) in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

**INTRADISTRICT ASSIGNMENT**

17.     Assignment to the San Francisco Division of this district is proper under Northern District of California Civil Local Rule 3-2(c) because a substantial part of the events of omissions which give rise to the claims asserted herein occurred, and PG&E's principal place of business is located, in San Francisco County, California.  Under Civil Local Rule 3-2(d), all civil actions which arise in the county of San Francisco shall be assigned to the San Francisco Division.

**PARTIES**

**Plaintiff**

18.     Plaintiff Oklahoma Firefighters Pension and Retirement System is an agency of the government of Oklahoma that manages the public pension system for firefighters in that state.  Plaintiff provides pension benefits such as normal retirement, disability retirement, surviving spouse benefits, and death benefits.  Plaintiff receives its funding from employer and member contributions, a portion of the state insurance premium tax and returns on investments.  Plaintiff was a shareholder at the time of the wrongdoing complained of herein.

**Nominal Defendant**

19.     Nominal Defendant PG&E Corporation is a California corporation with its principal executive offices located at 77 Beale Street, San Francisco, California 94177.  PG&E Corporation primarily operates through its wholly-owned subsidiary, the Utility.  See supra, at 1 n.1.  PG&E Corporation trades on the New York Stock Exchange under the ticker symbol "PCG."

20.     PG&E Corporation and the Utility, together, are herein referred to collectively as "PG&E" or the "Company."  See supra, at 1 n.1

**Director Defendants**

21.     Defendant Lewis Chew ("Chew") has been a director of PG&E since 2009 and is Chair of the Company's Audit Committee and a member of the Compliance and Public Policy Committee ("Compliance Committee").  He is the Executive Vice President and Chief Financial Officer of Dolby Laboratories, Inc., and has held that position since 2012.  He previously was Senior Vice President of Finance and Chief Financial Officer of National Semiconductor Corporation.

22.     Defendant Anthony F. Earley, Jr. ("Earley") is the former Executive Chair of the Company's Board of Directors.  He resigned that position in December 2017.  He had previously served as Chairman, Chief Executive Officer, and President of the Company since arriving at PG&E in September 2011.

23.     Defendant Fred J. Fowler ("Fowler") has been a director of PG&E since 2012 and is a member of the Company's Safety and Nuclear Oversight Committee ("Safety Committee")[7] and Finance Committee.  He is retired as Chairman of the Board of Spectra Energy Partners, LP, and was previously President and Chief Executive Officer of Spectra Energy Corp.

---

[7] That committed was formerly the Nuclear, Operations, and Safety Committee.  See Resolution of the Board of Directors of PG&E (Sept. 19, 2017), available at http://www.pgecorp.com/corp/about-us/corporate-governance/corporation-policies/dnuclear-operations-safety-committee.page.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    6

24.     Defendant Richard C. Kelly ("Kelly") has been a director of PG&E since June 2013 and is Non-Executive Chair of the Company's Board of Directors.  He also serves on the Audit Committee and Compensation Committee.  Kelly formerly served as Chairman and Chief Executive Officer of Xcel Energy, Inc., and previously held various other executive positions at Xcel Energy, Inc., including President, Chief Operating Officer, and Chief Financial Officer.

25.     Defendant Roger H. Kimmel ("Kimmel") has been a director of PG&E since 2009 and is Chair of the Company's Compliance Committee and a member of the Finance Committee.  Kimmel is Vice Chairman of Rothschild Inc. and has held that position since January 2001.  Prior to joining Rothschild Inc., Kimmel was a partner in the international law firm of Latham & Watkins LLP.

26.     Defendant Richard A. Meserve ("Meserve") has been a director of PG&E since 2006 and is Chair of the Company's Safety Committee.  He also serves on the Compliance Committee.  Meserve is President Emeritus of the Carnegie Institution of Washington.  He has served as Senior Of Counsel to the international law firm of Covington & Burling LLP since April 2004 and is a consultant on nuclear matters.

27.     Defendant Eric D. Mullins ("Mullins") has been a director of PG&E since 2016 and serves on the Company's Audit Committee and Safety Committee.  Mullins is Managing Director and Co-Chief Executive Officer of Lime Rock Resources, L.P.  Prior to co-founding Lime Rock Resources, L.P., Mullins worked in the Investment Banking Division of Goldman Sachs & Co. for fifteen years, most recently as Managing Director in the firm's Energy and Power Group.

28.     Defendant Forest E. Miller ("Miller") has been a director of PG&E since 2009 and is Non-Executive Chair of the Utility.  He also serves on the Company's Audit Committee and is the Chair of the Compensation Committee.  Miller formerly served as Group President of AT&T Corp., the Global Enterprise division of AT&T Inc., and held a variety of executive positions at SBC Communications and its predecessor Pacific Telesis Group.

29.     Defendant Rosendo G. Parra ("Parra") has been a director of PG&E since 2009 and serves on the Company's Compensation Committee and Safety Committee.  Parra is a

retired executive of Dell Inc.  He held various executive and senior management positions at Dell Inc., including Senior Vice President for the Home and Small Business Group and Senior Vice President and General Manager for Dell Americas.  Parra also is a co-founder of Daylight Partners and has been a partner of that firm since December 2007.

30.     Defendant Barbara L. Rambo ("Rambo") has been a director of PG&E since 2005 and Chairs the Company's Finance Committee.  She is also a member of the Company's Compensation Committee.  Rambo is Chief Executive Officer of Taconic Management Services.  Prior to joining Taconic Management Services in October 2009, she was Chief Executive Officer, Vice Chair, and a director of Nietech Corporation.  Rambo also has held a number of executive positions at Bank of America, including head of National Commercial Banking.

31.     Defendant Anne Shen Smith ("Smith") has been a director of PG&E since February 2015 and serves on the Company's Compliance Committee, Finance Committee, and Safety Committee.  Smith served as Chairman and Chief Executive Officer of Southern California Gas Company ("SoCalGas"), a subsidiary of Sempra Energy, from 2012 until her retirement in March 2014.  She also has held various other executive positions at SoCalGas, including President, Chief Operating Officer, Senior Vice President of Customer Services, and Vice President of Environment and Safety.

32.     The individuals identified in paragraphs 21 through 31 are herein collectively referred to as the "Director Defendants."

33.     Defendant Geisha J. Williams ("Williams") is Chief Executive Officer and President of PG&E.  She joined the Company in 2007 and has more than three decades of experience in the energy industry, including as President of the Utility.  In addition to serving on the Board of Directors, Williams is a director at the Edison Electric Institute and the Institute of Nuclear Power Operations.

34.     Defendant Jason P. Wells ("Wells") has served as the Company's Senior Vice President and Chief Financial Officer since January 2016.

35.     Defendant Patrick M. Hogan ("Hogan"), has served as the Company's Senior Vice President of Electric Operations and Vice President of Electric Strategy & Asset Management since he began working for the Company in 2013.

36.     The individuals identified in paragraphs 33 through 35 are herein collectively referred to as the "Officer Defendants."

37.     The Director Defendants and the Officer Defendants are collectively referred to as the "Individual Defendants" or as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## I.     BACKGROUND

38.     PG&E is one of the largest providers of electricity and natural gas in the state of California, providing natural gas and electricity to most of the northern two-thirds of California, from Bakersfield to near the Oregon border, coverage that includes 5.2 million households.

39.     The San Francisco Gas and Electric Company and the California Gas and Electric Corporation merged to form the Pacific Gas and Electric Company on October 10, 1905.   PG&E markets itself as being dedicated to "provid[ing] safe, reliable and responsive delivery of energy and customer service."[8]

40.     PG&E owns and operates major facilities that generate electricity and deliver large quantities of electricity and gas over significant distances in California.   These activities are potentially dangerous to the environment and the public, requiring PG&E to exercise extreme care and caution in its business operations.

41.     A power line can start a fire if it breaks in the wind and lands on flammable vegetation.   It can start a fire when a tree or a branch falls across it or when equipment gets old and malfunctions.   In 2015, fires started by electrical lines and equipment burned more acres in

---

[8] Bob D. Glynn [then Chairman of both PG&E Corp. and Pacific Gas and Electric Co.], Annual Shareholders Meeting Trs. (Apr. 16, 2003), available at http://www.pgecorp.com/investors/investor_info/presentations/20030416_sp.shtml.

California than any other cause.  Power lines have consistently been among the major causes of California wildfires.[9]

42.     Because of the danger posed by power lines, California has enacted a number of laws creating a duty for power companies to clear vegetation in proximity to the electrical grid. Most notably, Section 4293 of the California Public Resources Code states:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall … maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current:
>
> > (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet.
> >
> > (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet.
> >
> > (c) For any line which is operating at 110,000 or more volts, 10 feet.
>
> In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less.... The director or the agency which has primary responsibility for the fire protection of such areas may permit exceptions from the requirements of this section which are based upon the specific circumstances involved.

43.     Similarly, Section 4292 of the California Public Resource Code states that "any person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall … maintain around and adjacent to any pole or tower … a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower."

44.     These rules for mandatory clearance or firebreaks in the vicinity of power lines are reiterated in the State of California Rules for Overhead Electric Lines, which have been

---

[9] Ivan Penn, Power Lines and Electrical Equipment are a Leading Cause of California Wildfires, Los Angeles Times (Oct. 17, 2017), http://www.latimes.com/business/la-fi-utility-wildfires-20171017-story.html.

promulgated by the State of California Public Utilities Commission ("CPUC")—the Company's primary regulator.  CPUC General Order 95 explicitly requires power companies to:

> [E]stablish an auditable maintenance program for their facilities and lines. All companies must include a timeline for corrective actions to be taken following the identification of a Safety Hazard or nonconformances with General Order 95 on the company's facilities.  The auditable maintenance program shall prioritize corrective actions consistent with the priority levels set forth below and based on the following factors, as appropriate:
>
> – Safety and reliability as specified in the priority levels below;
>
> – Type of facility or equipment;
>
> – Location, including whether the Safety Hazard or nonconformance is located in an Extreme or Very High Fire Threat Zone in Southern California;
>
> – Accessibility;
>
> – Climate; [and]
>
> – Direct or potential impact on operations, customers, electrical company workers, communications workers, and the general public.

45.     The risk of wildfires is considered to be the highest priority level, representing "immediate safety and/or reliability risk with high probability for significant impact."  Power companies such as PG&E are required, upon identification of a safety hazard or non-conformance with regulations, to "take action ***immediately***, either by fully repairing the condition, or by temporarily repairing and reclassifying the condition to a lower priority."[10]

## II.     THE NORTHERN CALIFORNIA FIRES—THE WORST WILDFIRES IN CALIFORNIA HISTORY—BURNED OVER 380 SQUARE MILES AND CAUSED THE DEATHS OF AT LEAST 44 PEOPLE

46.     The Northern California Fires were a series of 250 wildfires that started burning across the state of California beginning in early October 2017.  Twenty-one of the wildfires became major fires that burned at least 245,000 acres of land, or 383 square miles.

47.     Days prior to the fires, the National Weather Service began issuing red-flag warnings throughout much of Northern California as conditions were expected to become

---

[10] CPUC General Order 95, § I.18.A(2)(a)(i) (2017) (emphasis added).

extremely volatile, with so-called Diablo winds expected to gust between 25 and 35 miles per hour from the northern end to the southern end of the state.

48.     Fueled by drought and wind, the wildfires raged throughout the Napa, Lake, Sonoma, Mendocino, Butte, and Solano counties, effectively leading to a major red-flag warning for much of Northern California.  PG&E reported that red-flag conditions existed in 44 of the 49 counties in its service area.  Seventeen separate wildfires were reported once the Northern California Fires began.

49.     These wildfires were also the most destructive ones of the 2017 California wildfire season. The Northern California Fires are the costliest group of wildfires on record in the United States, surpassing the 1991 Oakland Hills Fire, which until then had been the single costliest fire on record.  Insured losses are estimated to be $9.4 billion and PG&E has taken a pre-tax charge of $2.5 billion, which is the low end of its perceived exposure for certain, but not all, of the fires, excluding fines and penalties.  In addition, the Northern California Fires are predicted to cost the U.S. economy at least $85 billion.

50.     By October 14, 2017, the fires had burned 383 square miles of California, while forcing approximately 100,000 people to evacuate from their homes. The Northern California Fires killed at least 44 people and hospitalized at least 185 more, making the week of October 8, 2017, the deadliest week from wildfires in California history.  Collectively, this event constitutes the largest loss of life due to wildfires in the United States since the 1918 Cloquet Fire in Minnesota.  In total, an estimated 8,900 structures were destroyed.

III.    **THE *CAL FIRE* INVESTIGATION CONCLUDES THAT PG&E EQUIPMENT WERE THE PRIMARY CAUSES OF THE NORTHERN CALIFORNIA FIRES, WITH SOME OPERATING IN VIOLATION OF THE LAW**

51.     In response to the Northern California Fires, CAL FIRE opened an investigation into what it dubbed the "October Fire Siege" to determine, among other things, "[w]hat caused the infernos that killed 43 [sic] people and destroyed more than 8,000 buildings?"[11]

---

[11] Sonali Kohli, The Mystery Behind California's Most Destructive Wildfires: Who is to Blame, Los Angeles Times (Nov. 18, 2017), http://www.latimes.com/local/lanow/la-me-ln-fire-investigations-20171118-htmlstory.html.

**A.** **The McCourtney, Lobo, and Honey Investigations Are Referred to Criminal Prosecutors**

52. After an intensive investigation involving more than two dozen investigators,[12] CAL FIRE issued a press release on May 25, 2018 announcing that its investigation into the cause of four wildfires in Butte and Nevada counties had been completed,[13] stating in relevant part:

> CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.
>
> \* \* \*
>
> – The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.
>
> – The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. ***The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.***
>
> – The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters.  CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. ***The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.***
>
> – The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. ***The investigation found evidence that Public Resources Code 4293, which***

---

[12] Id.

[13] See Press Release, CAL FIRE, CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties (May 25, 2018), http://calfire.ca.gov/communications/communications_newsreleases (the "May 25, 2018 Press Release").

*requires adequate clearance between trees and power lines, was allegedly violated.*[14]

53.     CAL FIRE referred its findings concerning PG&E regarding the McCourtney, Lobo, and Honey investigations to criminal prosecutors for review.

**B.     Eight Additional Wildfires Caused by PG&E Equipment Are Referred to Criminal Prosecutors**

54.     On June 8, 2018, CAL FIRE issued its findings that an additional twelve Northern California wildfires during the October Fire Siege were caused by PG&E's electric power and distribution lines, conductors, and the failure of power poles.  More specifically, CAL FIRE found that these fires were caused by downed power lines contacting vegetation and/or trees and branches.  According to CAL FIRE's June 8, 2018 press release:[15]

> The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

> \* \* \*

> The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

> The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

> CAL FIRE investigators determined the **Norrbom Fire** was caused by a tree falling and coming in contact with PG&E power lines.

> CAL FIRE investigators determined the **Adobe Fire** was caused by a eucalyptus tree falling into a PG&E powerline.

> CAL FIRE investigators determined the **Partrick Fire** was caused by an oak tree falling into PG&E powerlines.

---

[14] May 25, 2018 CAL FIRE Press Release (emphasis added).

[15] See Press Release, CAL FIRE, <u>CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake and Napa Counties</u> (June 8, 2018), http://calfire.ca.gov/communications/downloads/newsreleases/2018/2017_WildfireSiege_Cause.pdf (the "June 8, 2018 Press Release").

CAL FIRE investigators determined the **Pythian Fire** was caused by a downed powerline after PG&E attempted to reenergize the line[.]

* * *

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire,** in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires—Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas—due to evidence of alleged violations of state law.

55.     Commenting on CAL FIRE's latest findings, CPUC's president Michael Picker was reported to have issued a veiled threat to cut PG&E's guaranteed profit level unless there was more improvement.[16]  Citing "uneven" safety progress since the 2010 San Bruno blast, Picker stated that the company still "falls short" and lacks a "consistent, robust, and accountable" safety program.[17]

## IV.     PG&E HAS SUFFERED SIGNIFICANT DAMAGE AS A RESULT OF ITS VIOLATIONS OF CALIFORNIA LAW, FALTERING RISK-MANAGEMENT SYSTEMS, AND THE RESULTING "OCTOBER FIRE SIEGE"

56.     PG&E's actions and inaction that were found by CAL FIRE to be "alleged violations of the law," including of California Public Resources Code sections 4293 and, by implication, 4292, as well as PG&E's lax and lacking risk-management and monitoring protocols, were significant causes of the wildly destructive October Fire Siege and are likely to result in massive financial and reputational harm to the Company.

---

[16] See Jaxon Van Derbeken, PUC Raises New Questions About PG&E's "Safety Culture", NBC Bay Area (May 8, 2018), https://www.nbcbayarea.com/news/local/PUC-Raises-New-Questions-About-PGEs-Safety-Culture-421686983.html.

[17] See id.

57.     A May 21, 2018 analysis by Morgan Stanley estimates that PG&E's eventual pre-tax liability could be approximately $5.2 billion, after factoring in settlements with insurance companies and other industries like telecommunications that could be found to have contributed to the fires.[18]

58.     The financial impact is already so great that on December 20, 2017, the Board of Directors of PG&E determined to suspend quarterly cash dividends on both the Corporation's common stock, beginning with the fourth quarter of 2017, and the Utility's preferred stock, beginning with the three-month period ending January 31, 2018, due to potential liabilities associated with the Northern California Fires.

59.     While the Company has yet to put a specific figure all-encompassing on losses associated with the Northern California Fires, it recently admitted it will "record a significant liability" for the quarter ended June 30, 2018, for losses associated with the fires.  The Company also disclosed that as of June 8, 2018, it had received approximately 200 complaints on behalf of at least 2,700 plaintiffs related to the Northern California Fires.  Much of the litigation involves a theory of inverse condemnation pursuant to which PG&E can *strictly liable for property damages and attorneys' fees if its equipment was a substantial cause of a fire*.

60.     The Company's losses may, in fact, be so great that they could force the Company into bankruptcy for the second time this century.  Indeed, recent media reports have asserted that PG&E has warned California lawmakers that losses may be so catastrophic that it may have to file bankruptcy.  A California state senator told a CBS affiliates in Sacramento that PG&E executives have been at the Capitol threatening bankruptcy to get lawmakers to bail them out.[19]

---

[18] Wildfire Update:  Litigation Damages and CAL FIRE, Morgan Stanley (May 21, 2018).

[19] Carl Surran, PG&E Warning of Bankruptcy After October Fires, California Lawmakers Say, Seeking Alpha (June 18, 2018), https://seekingalpha.com/news/3364601-pg-and-e-warning-bankruptcy-october-fires-california-lawmakers-say.

61.     Moreover, as described above, the Company faces criminal prosecution for at least three of the fires in the October Fire Siege investigated by CAL FIRE.  The Company is still on probation for its conviction in federal court for the San Bruno Explosion, and no known determination has been made about what an effect of a criminal conviction related to the Northern California Fires will have on the Company.

**V.      THE BOARD WAS ON NOTICE THAT THE COMPANY'S INTERNAL CONTROLS AND OVERSIGHT OF RISK, SAFETY, AND REGULATORY COMPLIANCE WERE FAILING**

62.     PG&E is a repeat offender with a long string of safety lapses ending in catastrophe.  These repeated safety lapses were the result of disastrous internal controls and oversight of risk, safety, and regulatory compliance.  Each new lapse provided further notice to the Board that it was failing in its duties, but ████████████████████████████████████ ████████

63.     PG&E's safety failures stretch back for decades.  For example, after the 1994 Trauner wildfire, PG&E was convicted of criminal charges.  The evidence suggested that PG&E used money raised from ratepayers for tree-trimming to pay management bonuses.[20]

64.     Rather than learning from this criminal behavior, from 2004 to 2009, of the nearly 700 "probable violations" of federal and state pipeline safety regulations tallied against California gas utilities, 410 were attributed to PG&E's gas operations.[21]  Those violations included shoddy maintenance records, inadequate training, and worker errors.  This number of violations was far more than all of the other utilities in the state combined.[22]

---

[20] Jaxon Van Derbeken, <u>Did Cutting Corners on Cutting Trees Trigger Butte Fire Disaster</u>, NBC Bay Area (Sept. 8, 2017), https://www.nbcbayarea.com/news/local/Did-Cutting-Corners-on-Cutting-Trees-Trigger-Butte-Fire-Disaster-443354623.html (reporting that a Nevada County prosecutor who won a conviction against PG&E for more than 700 negligence counts relating to the Trauner wildfire concluded that the Company had shifted $77 million from tree-cutting to boost profits and ensuing bonuses).

[21] Jaxon Van Derbeken, <u>Regulators Take Hands-Off Approach to PG&E</u>, SF Gate (Oct. 10, 2010), https://www.sfgate.com/news/article/Regulators-take-hands-off-approach-to-PG-E-3250276.php.

[22] <u>Id.</u>

65.     In December 24, 2008, an explosion and fire caused by a natural gas leak destroyed a residence in Rancho Cordova, California, killing one person, injuring five others, and causing damage to several nearby homes.  The National Transportation Safety Board ("NTSB") determined that the cause of the explosion was the use of a section of unmarked and out-of-specification pipe with inadequate wall thickness that allowed gas to leak from a mechanical coupling that had been installed by PG&E approximately two years earlier.  According to the NTSB, "[c]ontributing to the accident was the 2-hour 47-minute delay in the arrival at the job site of a [PG&E] crew … properly trained and equipped to identify and classify outdoor leaks and to begin response activities to ensure the safety of the residents and public."[23]  Seven months after the explosion in Rancho Cordova, CPUC utilities engineer Banu Acimis stated, "'We do not believe PG&E's actions have satisfactorily addressed' the requirement that the utility issue a protocol for dealing with leaks."[24]

66.     One would think that this string of failures would lead the Board to appropriately focus on safety.  But with PG&E, past is apparently prologue, culminating in an ongoing incomprehensible disregard for safety that ended in catastrophe.

A.     PG&E's Responsibility for the San Bruno Explosion

67.     On September 9, 2010, an explosion occurred in San Bruno, California, when a 30-inch diameter natural gas transmission pipeline owned and operated by PG&E ruptured and exploded in flames in the Crestmoor residential neighborhood.

68.     The San Bruno Explosion created a crater about 72 feet long by 26 feet wide.  A 3,000-pound section of pipe was ejected from the crater and landed in the middle of Glenview Drive.  The explosion killed eight people and injured 58 others.  It destroyed 38 homes and caused moderate to severe damage to 17 homes and minor damage to 53 others.

---

[23] National Transportation Safety Board, Pipeline Accident Brief at 16, adopted May 18, 2010, available at https://www.ntsb.gov/investigations/AccidentReports/Reports/PAB1001.pdf.

[24] Jaxon Van Derbeken, Regulators Take Hands-Off Approach to PG&E, SF Gate (Oct. 10, 2010), https://www.sfgate.com/news/article/Regulators-take-hands-off-approach-to-PG-E-3250276.php.

69.     The NTSB issued a report that blamed the explosion on PG&E's poor management of the pipeline and a lack of oversight by state and federal regulators.  In January 2011, federal investigators reported that the probable cause of the accident was PG&E's:  "(1) inadequate quality assurance and quality control … which allowed the installation of a substandard and poorly welded [sic] pipe section with a visible seam weld flaw that, over time, grew to a critical size, causing the pipeline to rupture…; and (2) inadequate pipeline integrity management program, which failed to detect and repair or remove the defective pipe section."[25]  Because of PG&E's inadequate testing protocols and record-keeping, the poorly-welded pipeline was not detected.[26]

70.     PG&E was fined $1.6 billion by the CPUC after it was found negligent in causing the San Bruno Explosion.  In the aftermath, a federal judge ordered PG&E to conduct a $3 million advertising campaign to apologize for its conduct.  In those ads, which began airing in March 2017, the utility said, "On Sept. 9, 2010, PG&E learned a tragic lesson we can never forget."[27]

**B.     PG&E Was Found Guilty of Criminal Charges, Including Obstruction of Justice, In Connection With The San Bruno Explosion, Arising In Part Out Of Deficient Pipeline "Integrity Management"**

71.     After a nearly six-week trial, a federal jury found PG&E guilty on August 9, 2016 of willful violations of the Natural Gas Pipeline Safety Act of 1968 ("PSA"), 49 U.S.C. § 60123, and obstructing an agency proceeding.  The PSA-related charges stemmed from PG&E's inadequate record-keeping and deficient pipeline "integrity management" practices uncovered in the course of the San Bruno investigation.  An obstruction charge was added after investigators discovered PG&E attempted to mislead the NTSB during its investigation.[28]

---

[25] See National Transportation Safety Board, Pipeline Accident Report at xii, Jan. 2011, available at https://www.ntsb.gov/investigations/AccidentReports/Reports/PAR1101.pdf.

[26] Id.

[27] Gas Company Apologizes for 2010 Explosion, ABC 13 News (Mar. 25, 2017), http://abc13.com/business/gas-company-apologizes-for-2010-explosion/1818688/.

[28] Press Release, United States Attorney's Office for the Northern District of California, PG&E Ordered to Develop Compliance and Ethics Program as part of its Sentence for Engaging in

72.     "'The FBI San Francisco Division echoes the sentiments of our law enforcement and prosecutorial partners.  PG&E demonstrated a lack of concern and irresponsibility to our community,' said FBI San Francisco Special Agent in Charge Jack Bennett.  'We have a responsibility not only to uphold and enforce the laws of the United States but also to do everything within our power to protect our citizen's [sic] and our community.  This sentence is symbolic of the FBI's commitment to serving justice and to show that no company is too large to be held accountable for criminal acts.'"[29]

73.     The Honorable Thelton E. Henderson ordered PG&E to pay the maximum statutory penalty allowable for each count charged under the PSA and for obstruction of justice—which totaled $3 million.  In addition to the monetary penalty, Judge Henderson ordered PG&E to the maximum term of five years' probation.  While on probation, PG&E has been and is required to submit to corporate compliance and ethics monitors, pay for advertising in national media outlets to publicize its criminal conduct, and engage in community service.[30]

**C.     PG&E's Poor Vegetation Management Caused the Massive Butte Fire; Less Than Three Years Later, Similar Problems Caused the Northern California Fires**

74.     In September 2015, PG&E's poor vegetation management caused a massive wildfire in Amador and Calaveras Counties.  The Butte Fire raged out of control, causing large-scale damage.  "According to CAL FIRE, the fire burned 70,868 acres, caused two deaths, destroyed 549 homes, 368 outbuildings and four commercial properties, and damaged 44 structures."[31]   Liability for the fire remains an unresolved issue.

75.     Just as in the case of the Northern California Fires, the Butte Fire started because PG&E power lines came into contact with vegetation, sparking a devastating conflagration.  The CPUC determined that PG&E violated CPUC General Order 95 and caused the Butte Fire

---

Criminal Conduct (Jan. 26, 2017), available at https://www.justice.gov/usao-ndca/pr/pge-ordered-develop-compliance-and-ethics-program-part-its-sentence-engaging-criminal.

[29] Id.

[30] Id.

[31] PG&E's Form 10-Q at 37 (May 3, 2018).

1  by exposing unstable trees as part of its vegetation management program.[32]  Similarly, the CAL

2  FIRE investigation of the Northern California Fires determined that many of the initial fires

3  were caused by PG&E power lines coming into contact with vegetation.

4        76.     PG&E has paid out at $734 million in damages for the Butte Fire thus far; it

5  estimates that it will pay out a total of $1.1 billion.[33]  Less than three years later, the Company

6  will likely be liable for a much greater sum arising out of the Northern California Fires.

## VI.  FAILURES OF THE BOARD AND COMMITTEE MEMBERS WITH REGARD TO OVERSIGHT OF RISK MANAGMENT

9        77.     PG&E's Officers and Directors each have a fiduciary duty to ensure compliance

10  with the law by creating a culture of safety and compliance and to effectively manage risks to

11  the Company.  These duties exist, in part, to minimize the risk of serious negative events that

12  would significantly impact and harm PG&E.

13        78.     PG&E has even codified some of the fiduciary duties owed by the Officers and

14  Directors to the Company.[34]  For example, the Director Code in effect during the relevant

15  period stated that Directors "are accountable for all of our own actions:  these include safety,

16  protecting the environment, and supporting our communities."[35]  Furthermore, the Director

17  Code instructed Directors to "promote ethical behavior" and to "comply with all of the laws,

18  rules, and regulations of the United States and other countries, as well as the states, counties,

19  cities, and other jurisdictions, applicable to [the Company] or its business."[36]  Accordingly,

---

[32] March 29, 2017 CPUC Incident Investigation Report, at
http://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_Safety_and_Reliability/Facility_Safety/Citations/E20150916-01%20Public%20Butte%20Incident%20Investigation%20Report%20wo%20Attachments1.pdf.

[33] PG&E Form 10-Q (May 3, 2018) at
https://www.sec.gov/Archives/edgar/data/75488/000100498018000005/pge-033118x10q.htm.

[34] PG&E Corp. and Pacific Gas and Electric Company's The Code of Business Conduct and Ethics For Directors (the "Director Code"), effective Dec, 21, 2011,  available at
http://corpdocs.gmianalyst.com/ethics/eth_13990.pdf.

[35] Id.

[36] Id.

there can be no doubt that California Public Resources Code sections 4292 and 4293 were known to the Director and Officer Defendants.

79.     The misconduct of the Defendants resulted in several major catastrophes that have destroyed PG&E's credibility and caused substantial financial damage to the Company. The culture that led to the ongoing failures and catastrophic incidents at issue was fostered under the leadership of the Defendants.

80.     At all relevant times, PG&E was required to maintain an information and reporting system designed to inform the Board of regulatory compliance failures and materially unsafe business operations so that the Board would be able to fulfill its duties of ensuring the Company's compliance with applicable regulations and ensuring safe business operations.  In the wake of repeated catastrophic fires and explosions due to PG&E's safety failures, Defendants should have taken a number of basic steps to monitor PG&E's information and reporting system.  Among other steps, Defendants should have ensured the Company's compliance with the obligations imposed by state and federal regulations, ordered internal audits and reviews of the Company's regulatory compliance systems to ensure that it was functioning in accordance with these regulations, and increased the resources to address the risk of wildfires.

81.     PG&E has acknowledged that it is facing claims relating to the Northern California Fires that will likely exceed $2.5 billion.[37]  This includes liability for claims arising from fires that CAL FIRE has determined stemmed from violations of California Public Resources Code section 4293 (and, by implication, section 4292), and it excludes certain other fires for which PG&E finds it too speculative to assume a loss (such as the Atlas and Tubbs

---

[37] PG&E's Form 8-K at 3 (June 21, 2018).

1  fires).[38] ██████████████████████████████████████████

2  ████████████████████████████████████████████████

3          82.     Although liability for the claims will be borne by the Company, and the costs

4  ultimately will be paid by PG&E shareholders, responsibility for these claims in large part rests

5  with the Company's Officers and Directors who knowingly breached their fiduciary duties.

6          **A.**    ████████████████████████████████████████████

7          ████████████████████

8          83.     As detailed above, PG&E has been held responsible for multiple deaths, paid

9  millions of dollars in fines and penalties, and has been criminally convicted for its failure to

10  meet safety requirements.  The seriousness and reasons for these consequences to the Company

11  were known by the Director Defendants.

12          84.     Defendants had actual knowledge that they were failing to comply with the

13  California Public Resources Code as a result of their access to reporting systems and reports

14  concerning the Company's regulatory compliance.  Despite this Defendants failed to ensure

15  compliance with the California Public Resources Code.

16          85.     In addition to these overarching breaches of fiduciary duty, ████████████

17  ████████████████████████████████████████████████

18  ██████████████████████████████████████████████████

19  ██████████████████████████████████████[40]

20          86.     ████████████████████████████████████████

21  ██████████████████████████████████████████████████

22

23

────────────────────

24  [38] Id.  PG&E also excludes potential penalties and fines that may be imposed by government
    entities on it.  Id. at 3.  Further, the $2.5 billion "lower range of [PG&E's] reasonably estimated

25  losses…."  Id.; see supra at ¶ 13.

26  [39] ██████████████████████████████████████████████

27  ████████████████████████████

    [40] PG&E, Risk Management Policy (2017), available at http://www.pgecorp.com/

28  corp_responsibility/reports/2017/bu03_risk_management.html

────────────────────

1

2

3

4

5

6

7       **B.** █████████████████████████████████████████████

8       ████████████████████████████████████

9       87.     The responsibilities and duties of the Audit Committee are set forth in its

10      Charter.  The Audit Committee is required to, among other things:

11              [A]dvise and assist this Board in fulfilling its responsibilities for this corporation
                in connection with monitoring and overseeing … compliance with legal and
12              regulatory requirements.  The Audit Committee shall oversee these areas for this
                corporation and all of its controlled subsidiaries and affiliates, and, to the extent
13              practicable and desirable, for any of this corporation's subsidiaries and affiliates
                that it does not control.
14
                                                    * * *
15
                (a) Discuss this corporation's guidelines and policies that govern the processes by
16              which major risks are assessed and managed;

17              (b) discuss the major financial risk exposures and the overall steps that
                management has taken to monitor and control such exposures; and
18
                (c) to the extent that any aspect of risk assessment and management is delegated
19              to another committee of the Board, the Audit Committee shall generally review
                the processes by which such risk assessment and management are undertaken.
20

21              88.     In addition, the Audit Committee is clearly required to "report regularly to the

22      Board of Directors on the Committee's deliberations and actions taken."  The Audit

23      Committee's responsibilities encompass oversight of the Company's compliance with

24      regulatory requirements intended to reduce the chances of electrical and distribution lines

25      causing wildfires like those that occurred in the Northern California Fires.

26      _____

27      41 ████████████████████████████████████████████████████████
        ████████████████████████████

28      42 ██████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          24

89.     Under its Charter, the Audit Committee is specifically responsible for monitoring PG&E's policies and procedures for regulatory compliance, and risk assessment and management, with regular reports going to management and the Company's Board.  Because the responsibilities and duties of the Audit Committee are set forth in its Charter, there can be no doubt that Audit Committee members knew of risk-management programs at the Company and were cognizant of their responsibility to oversee and manage operating risks—including the risk of wildfires. █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

90.     ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████ █ ██████████████████████████████████████

███████████████████████████

91.     ████████████████████████████████████████████████████████████

█████████████████████████████ █ ██████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

-------------------

43 ████████████████████████████████████████████████████████████████

██████

44 ████

45 ████

46 ████████████████████████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

92.   ████████████████████████████████ a federal jury found PG&E

guilty, on August 9, 2016, of willful violations of the PSA and obstructing an agency

proceeding with regard to the San Bruno Explosion.

     **C.**   **The Compliance and Public Policy Committee Failed to Ensure PG&E Was in Compliance with All Applicable Regulations and Operating in a Safe and Legal Manner.**

93.   The Compliance and Public Policy Committee's ("Compliance Committee")

responsibilities are parallel to those of the Audit Committee.  The Compliance Committee's

Charter requires its members to, among other things:

> Review and oversee the corporation's compliance program, including, but not limited to, evaluating its effectiveness.

> Review periodic reports from management, including, but not limited to, the Chief Ethics and Compliance Officer (the "CECO") and other operations, compliance, and legal personnel, with respect to (a) the corporation's compliance with laws, regulations, and internal policies and standards, (b) significant pending or threatened litigation and government investigations, examinations, inquiries, demands, or proceedings, in each case which raise or would be expected to raise significant compliance issues, and (c) any other significant claim or complaint alleging that the corporation is not in compliance with laws, regulations, or internal policies and standards.

> Review (a) periodic reports with respect to internal or external compliance reviews or audits conducted by the corporation, regulators, or third parties, and (b) reports by management with respect to their work to address any significant deficiencies, findings, and recommendations identified in any such review or audit.[48]

---

[47] ████████████████████████████

[48] PG&E, Compliance and Public Policy Committee Charter (Sept. 19, 2017), available at http://www.pgecorp.com/corp/about-us/corporate-governance/corporation-policies/compliance-public-policy-committee.page.

94.     The responsibilities set forth above encompass oversight of the Company's compliance with regulatory requirements intended to reduce the chances of electrical and distribution lines causing wildfires like those that occurred during the Northern California Fires.

95.     The Compliance Committee is responsible for ensuring that PG&E is in compliance with all applicable regulations and that its businesses are operating in a safe and legal manner.  Because the responsibilities and duties of the Compliance Committee are set forth in its Charter, there can be no doubt that Compliance Committee members knew of risk-management programs at the Company and were cognizant of their responsibility to oversee and manage operating risks—including the risk of wildfires.

96.     ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ ██ ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████ █

97.     ███████████████████████████████████████

████████████████████████████████████████████████████

████ ███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

────────────────
49 ████████████████████████████████████████████████

█████████████████

50 ███

**D.** █████████████████████████████

98.     The basic responsibility of the Finance Committee is to assist the Board with regard to "the financial and investment policies, risks, and objectives" of the Company "including specific actions required to achieve those objectives."[52]  More specifically, the Finance Committee is required to (among other things):

> Discuss (a) the Corporation's major financial risk exposures associated with (i) energy commodities and derivatives, (ii) merger and acquisition transactions considered by this Committee, and (iii) selected risks that are identified in consultation with this Board of Directors, the Board of Directors of the Utility, and their respective committees, as applicable, and assigned by the Audit Committee to this Committee for discussion and oversight, including non-operational risks identified through the Corporation's enterprise risk management program, and (b) the overall steps that management has taken to monitor and control such exposures.[53]

**E.** ████████████████████████

99.     The Safety Committee also has significant responsibilities with regards to risk management and operational safety—clearly outlined in its Charter, which requires members to, among other things:

> Review significant policies and issues related to safety, operational performance, and compliance.

---

[51] ██

[52] PG&E, Finance Committee Charter (Dec. 16, 2015), available at http://www.pgecorp.com/corp/about-us/corporate-governance/corporation-policies/finance-committee.page.

[53] Id.

[54] ████████████████████████████████

Review with management the principal risks related to or arising out of PG&E's Operations and Facilities (including risks that are identified through PG&E's enterprise risk management program and that are selected in consultation with this Board of Directors and its committees, as applicable), and assess the effectiveness of PG&E's programs to manage or mitigate such risks, including with respect to:

- the safe and reliable operation of any nuclear facilities owned by PG&E;

- integrity management programs for PG&E's gas operations and facilities; and

- asset management programs for PG&E's electric operations and facilities;

Review and discuss how PG&E can continue to improve its safety practices and operational performance;

Review and discuss the results of PG&E's goals, programs, policies, and practices with respect to promoting a strong safety culture.[55]

100.  ███████████████████████████████

████████████████████████████████████████

███████████

101.  ████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████ █████████████████

████████████████████████████████████████████

███████████████████████████████

██████████████████████████████
█████████████████████████████
███████████████████████████████
██████████████████████████ ██

---

[55] PG&E, Safety and Nuclear Oversight Committee Charter (Sept. 19, 2017), available at http://www.pgecorp.com/corp/about-us/corporate-governance/corporation-policies/dnuclear-operations-safety-committee.page.

[56] ████████████████████████████████████
██████████████████████████

[57] ██████████████████████



102. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████ ■

103. ███████████████████ be viewed in the context of PG&E's record with safety and change.  As discussed <u>supra</u>, PG&E had hundreds of safety violations identified to it from 2004 through 2009, with an explosion (killing one person) that occurred due to lack of safety measures and non-compliant materials.  And in 2010, the San Bruno fire occurred, which was found to be caused by inadequate quality control and pipeline management and integrity.  All of this led to reports and findings rebuking PG&E, together with criminal convictions and regulatory settlements.

104. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████

105. ██████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

█████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████

58
████████████████████████████████████
████████████████████████

106.

107.

108.

**F.** ███████████████████████████████████
██████

109.   ███████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████  ██████████████
█████████████████████████████████████████
██████████

## VII.   THE COMPANY'S FALSE AND MISLEADING PROXY STATEMENT

110.   While the Defendants ignored safety in favor of profits and lucrative bonuses, they simultaneously misled investors regarding the risk that the Company's unsafe operations posed to causing catastrophic wildfires.

111.   For example, in the Company's April 18, 2017, Definitive Proxy Statement ("2017 Proxy Statement") filed with the SEC pursuant to Section 14(a) of the Exchange Act, Defendants discussed the Company's risk-management program and the related duties of the Board and its Committees, stating in pertinent part:

> PG&E Corporation and the Utility continue to review and refine the approach to the companies' risk management programs. In 2011, the companies expanded their Enterprise Risk Management program to examine all enterprise and operational company risks, and to increase Board review of risk management. The program was renamed as the Enterprise and Operational Risk Management ("EORM") program in 2013 to reflect its expanded scope. At that time, risk management was integrated into the companies' planning and budgeting process, which leads to the identification of specific enterprise risks for review and oversight by the Corporation and Utility Boards.
>
> [T]he companies' risk management governance structures allow risks to be investigated both under a Board-directed review process and also from a

---

64 ███████████████████████████████████████
███████████████████████████████████████
██████

65 ███████████████████████████████████████

"bottoms-up" approach that allows operational experts to add their knowledge and identify emerging issues for the companies.

As part of their oversight functions, the Boards generally oversee the companies' risk management policies and programs; however, management has day-to-day responsibility for assessing and managing exposure to various risks. Enterprise risks are reviewed annually by the Boards' Audit Committees, and oversight for specific risk categories is allocated to various Board committees, consistent with the substantive scope of each committee's charter. Each such committee provides a report of its activities to the applicable Board.[66]

112.    These and similar statements in the Proxy Statement are false and misleading because they describe a well-functioning risk-management system at the Company when the Defendants either knew or should have known that PG&E lacked effective safety protocols. This is not simply hindsight.  The failures of the risk-management protocols and systems were critical, paramount issues at PG&E over the preceding decade, with major catastrophes occurring as a result of such failures and penalties, reports and findings, and convictions all issued as a result of those repeated failures.

113.    The Defendants' deception damaged the Company by providing false information to shareholders in connection with the election of Directors.  Had the truth of the ████████████████████████████, shareholders might have refused to elect the Director Defendants.[67]

## DERIVATIVE ALLEGATIONS

114.    Shareholder brings this action derivatively to redress injuries suffered by the Company as a direct result of the Defendants' breaches of fiduciary duty and other breaches by the Defendants.

115.    Shareholder has owned PG&E stock continuously, since at least July 31, 2015, during the time of the wrongful course of conduct by the Defendants alleged herein, and continues to hold PG&E stock.

---

[66] PG&E's Proxy Statement at 25 (Apr. 18, 2018).

[67] There is currently a securities class action pending in the Northern District of California on behalf of investors damaged as the result of false and misleading statements regarding the risk of wildfires in Northern California.  This action is entitled <u>Weston v. PG&E Corp., et al.</u>, No. 3:18-cv-03509 (N.D. Cal.).

116.     Shareholder will adequately and fairly represent the interests of PG&E and its shareholders in enforcing and prosecuting the Company's rights.

**DEMAND ON THE BOARD IS EXCUSED BECAUSE IT IS FUTILE**

117.     As of the date that this Verified Shareholder Derivative Complaint was filed, PG&E had 12 directors.

118.     Plaintiffs have not made any demand on PG&E Corporation's Board of Directors to investigate and prosecute the wrongdoing alleged herein.  Such a demand is excused because: (i) making a demand would be a futile and useless act as the majority of PG&E Corporation's directors are not able to conduct an independent and objective investigation of the alleged wrongdoing; and (ii) the wrongful conduct of the Director Defendants is not subject to protection under the business judgment rule.  Under such circumstances, the demand requirement is excused, since making such a demand on the Board of Directors would be futile.

119.     Each of the Director Defendants faces a significant likelihood of non-exculpated personal liability for his or her utter disregard of their fiduciary duty to implement internal controls sufficient to: (i) monitor and ensure the Company complies with applicable legal obligations and requirements; (ii) remain informed as to the Company's internal controls and, upon receipt of notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and (iii) promote a corporate climate that adequately emphasizes safety and compliance.

120.     Defendants in this case lack the objectivity to judge their own misconduct.  Since a majority of the Board engaged in the wrongdoing alleged herein, they have interests adverse to performing a fair and unbiased investigation.  Each of the Director Defendants has been a member of the Board of Directors of the Company through a series of disasters, fires, lawsuits, convictions, and findings of an inadequate culture of safety and compliance.  Each of the Director Defendants, particularly ██████████████████████████████ ███████████████████████████████████████

1   ████████████████ leading up to the Northern California Fires and is therefore incapable of

2   impartially deciding whether they have violated their fiduciary duties.

3       121.    Defendant Rambo has been a member of the Board of Directors since

4   January 2005. She is the longest-tenured member of the Board and has continued to serve on the

5   Board before, during, and in the aftermath of the Rancho Cordova Disaster, the San Bruno

6   Explosion, and the Butte Fire.   She is the chair of the Finance Committee and also serves on the

7   Compensation Committee.

8       122.    Defendant Meserve has been a director of PG&E since 2006.  He was on the

9   Board before, during, and in the aftermath of the Rancho Cordova Disaster, the San Bruno

10   Explosion, and the Butte Fire.  He is also a member of the Compliance Committee and chair of

11   the Safety Committee.

12       123.    Defendant Chew has been a member of the Board of Directors since

13   September 2009.  He was on the Board before, during, and in the aftermath of the San Bruno

14   Explosion and the Butte Fire.  During the relevant period he was chairman of the Audit

15   Committee and a member of the Compliance Committee.

16       124.    Defendant Kimmel has been a member of the Board of Directors since January

17   2009.  He was on the Board before, during, and in the aftermath of the San Bruno Explosion

18   and the Butte Fire.  He also chairs the Compliance Committee with the additional

19   responsibilities conferred by that committee's charter and is a member of the Finance

20   Committee.

21       125.    Defendant Miller has been a director since February 2009.  He was on the Board

22   before, during, and in the aftermath of the San Bruno Explosion and the Butte Fire.  He also

23   serves as chair of the Compensation Committee and as a member of the Audit Committee.

24       126.    Defendant Parra has been a member of the Board of Directors since September

25   2009 and was on the Board before, during, and in the aftermath of the San Bruno Explosion and

26   the Butte Fire.  He is also a member of the Compensation Committee and the Safety Committee.

27       127.    Defendant Kelly has been a director of the Company since June 2013.  He joined

28   the Board in the wake of the San Bruno Explosion and was on the Board before, during, and in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT        35

the aftermath of the Butte Fire.  He is also a member of the Audit Committee and the Compensation Committee.

128.    Defendant Fowler has been a director of the Company since March 2012.  He came to the Board in the wake of the San Bruno Explosion and was on the Board before, during, and in the aftermath of the Butte Fire.  He is also a member of the Safety Committee and Finance Committee.

129.    Defendant Smith has been a director of the Company since February 2015. She joined the Board in the immediate aftermath of the Butte Fire and is a member of both the Compliance Committee and the Safety Committee.

130.    Defendant Mullins has been a director of the Company since September 2016, serving since the Butte Fire.  Defendant Mullins also serves on the Safety Committee and the Audit Committee.

131.    Defendant Williams is Chief Executive Officer ("CEO") and President of PG&E. She joined the company in 2007 and, prior to becoming CEO and a member of the Board in March 2017, she served as president of the Utility.  She has been, for an extended period of time, one of those principally responsible for ensuring that the day-to-day operations of the Company comply with all necessary laws and regulations.  She is responsible for the operations of the Company and derives her living from her position as an employee of the Company and is not independent.

132.    Thus, all told, 10 of the Company's 11 directors are unable to exercise their independent judgement with respect to whether to hold the Defendants responsible for their breaches of fiduciary duties in connection with the Northern California Fires.  Each of them has served on the Board and on critical committees with specific responsibilities, and each of them has failed utterly to promote the culture of safety and compliance required by their fiduciary duties.

### FIRST CLAIM FOR RELIEF
#### (Against all Defendants)
#### Breach of Fiduciary Duty

133.   Shareholder incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

134.   Each of the Defendants owed and owe fiduciary duties to PG&E and its shareholders under California law.  By reason of their fiduciary relationships, Defendants specifically owed and owe PG&E the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the Company, including the administration and management of risk management and risk mitigation.

135.   Additionally, Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Director Code and the Charters of the various Board committees that, had they been discharged in accordance with Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

136.   Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to PG&E and its shareholders in at least the following ways:

a.   Allowing the Company to operate in violation of California State laws and regulations, including, but not limited to: California Public Resources Code section 4293, California Public Resource Code Section 4292, and CPUC General Order 95;

b.   █████████████████████████████████████████████
████████████████████████

c.   █████████████████████████████████████████████
███████████████████████████████████████

d.   █████████████████████████████████████████████
████████████████████████████████

e.   Allowing the Company to issue a false and misleading proxy statement that exaggerated the efficacy of the Company's risk-management practices;

1          f.          Allowing the Company to obstruct regulatory investigations in order to

2    forestall corporate reforms of the Company's risk-management program;

3          g.          Engaging in abuse of control and gross mismanagement of the Company

4    by diverting money from the Company's risk-management program to profits and employee

5    bonuses.

6          137.    PG&E's certificate of incorporation contains a provision, which purports to limit

7    the liability of the Company's directors, stating, "[t]he liability of the directors of the

8    Corporation for monetary damages shall be eliminated to the fullest extent permissible under

9    California law."

10         138.    However, pursuant to California Corporations Code Section 204(a)(10), a

11   corporation cannot eliminate or limit the liability of directors:

> (i) for acts or omissions that involve intentional misconduct or a knowing and
> culpable violation of law, (ii) for acts or omissions that a director believes to be
> contrary to the best interests of the corporation or its shareholders or that involve
> the absence of good faith on the part of the director, (iii) for any transaction from
> which a director derived an improper personal benefit, (iv) for acts or omissions
> that show a reckless disregard for the director's duty to the corporation or its
> shareholders in circumstances in which the director was aware, or should have
> been aware, in the ordinary course of performing a director's duties, of a risk of
> serious injury to the corporation or its shareholders, [or] (v) for acts or omissions
> that constitute an unexcused pattern of inattention that amounts to an abdication
> of the director's duty to the corporation or its shareholders ….

18         139.    The Defendants actions as described herein were not a good-faith exercise of

19   their duty to protect and promote the Company's corporate interests and showed a reckless

20   disregard for the interests of PG&E and its shareholders.  Defendants conspired to abuse, and

21   did abuse, the control vested in them by virtue of their positions in the Company.

22         140.    As a direct and proximate result of Defendants' breaches of fiduciary duties

23   described herein, the Company has sustained damages.

24         141.    As a direct and proximate result of Defendants' misconduct described herein,

25   Defendants are liable to the Company.

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    38

### SECOND CLAIM FOR RELIEF
#### (Against All Defendants)
#### Unjust Enrichment

142.    Shareholder incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

143.    During the relevant period, Defendants received salaries, fees, stock awards or similar compensation from PG&E that was unjust in light of Defendants' bad faith conduct and violations of the Company's corporate governance standards.  The chart below shows Director Defendants' generous compensation for 2017 alone, as detailed in the Company's 2018 Proxy Statement:

| Name | Fees/Salary Earned | Stock Awards | Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|
| L. Chew | $153,545.00 | $139,989.00 | NA | $96.00 | $293,630.00 |
| F. Fowler | $137,750.00 | $139,989.00 | NA | $96.00 | $277,835.00 |
| R. C. Kelly | $144,667.00 | $139,989.00 | NA | $96.00 | $284,752.00 |
| R. H. Kimmel | $125,880.00 | $139,989.00 | NA | $96.00 | $265,965.00 |
| R. A. Meserve | $135,000.00 | $139,989.00 | NA | $96.00 | $275,085.00 |
| F. E. Miller | $178,819.00 | $139,989.00 | NA | $96.00 | $318,904.00 |
| E. D. Mullins | $120,000.00 | $139,989.00 | NA | $96.00 | $260,085.00 |
| R. G. Parra | $120,000.00 | $139,989.00 | NA | $1,096.00 | $261,085.00 |
| B. L. Rambo | $130,000.00 | $139,989.00 | NA | $96.00 | $270,085.00 |
| A. S. Smith | $131,500.00 | $139,989.00 | NA | $1,096.00 | $272,585.00 |
| B. L. Williams | $76,745.00 | $0.00 | NA | $96.00 | $76,841.00 |
| G. J. Williams | $991,667.00 | $6,500,168.00 | $996,810.00 | $108,575.00 | $8,597,220.00 |

144.    Shareholder, as a representative of PG&E, seeks restitution from Defendants and an order from this Court disgorging all profits, benefits and other compensation—including salary, fees, options, stock awards, and performance-based compensation—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

### THIRD CLAIM FOR RELIEF
**(Against the Director Defendants)**
**Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**

145.     Shareholder incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein, except to the extent those allegations plead knowing or reckless conduct by Director Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Director Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegations of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

146.     SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

147.     The 2017 Proxy Statement contained proposals to PG&E's shareholders, urging them to re-elect certain members of the Board, elect new members of the Board, and provide an advisory vote to approve the executive compensation plan.  The 2017 Proxy Statement, however, misstated or failed to disclose: (a) ███████████████████████████ ███████████████ that were known to the Board when the 2017 Proxy Statements was filed; and (b) ███████████████████████████████████████ ██████████

148.     The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders that were contained in the 2017 Proxy Statement.

149.     The misleading information contained in the 2017 Proxy Statement was material to PG&E's shareholders in determining whether or not to accept the Company's

1    recommendations therein for the election of directors and ratification of the Board-approved

2    compensation plan.

3         150.    By reasons of the conduct alleged in this Complaint, the Defendants violated

4    Section 14(a) of the Exchange Act and SEC Rule 14a-9.

5         151.    Shareholder, on behalf of PG&E, thereby seeks relief for damages inflicted upon

6    the Company based on the misleading 2017 Proxy Statement in connection with the improper

7    re-election of the members of the Board and approval of executive compensation.

8         152.    The Proxy Statement is false and misleading because it describes a well-

9    functioning risk-management system at the Company ███████████████████████████

10   ███████████████████████████████████████ The history of accidents,

11   wildfires, massive settlements (both with government entities and private parties), fines, and

12   criminal convictions, ███████████████████, makes clear PG&E did not have the

13   competent risk-management systems in place that they claimed.

14        153.    This action was timely commenced within three years of the date of the Proxy

15   Statement and within one year from the time Plaintiffs discovered or reasonably could have

16   discovered the facts on which this claim is based.

17                            **PRAYER FOR RELIEF**

18        WHEREFORE, Shareholder prays for relief and judgement as follows:

19        A.      Determination that this action is a proper derivative action maintainable under

20   the law and that demand was excused as futile;

21        B.      Declaring the Defendants have breached their fiduciary duties to PG&E;

22        C.      Determining and awarding PG&E the damages sustained by it as a result of the

23   violations set forth above from each Defendant, jointly and severally, together with pre-

24   judgment and post-judgement interest;

25        D.      Directing PG&E to take all necessary actions to reform and improve its corporate

26   governance and internal procedures to comply with applicable laws and to protect the Company

27   and its shareholders from a repeat of the damaging events described in this Complaint;

28

1       E.      Extraordinary equitable or injunctive relief as permitted by law or equity,

2 including attaching, impounding, imposing a constructive trust on, or otherwise restricting

3 Defendants' assets so as to assure Plaintiff, on behalf of PG&E, an effective remedy;

4       F.      Awarding to PG&E restitution from Defendants, and each of them, and ordering

5 disgorgement of all profits, benefits, and other compensation obtained by Defendants;

6       G.      Ordering an accounting of all compensation awarded to the Defendants;

7       H.      Awarding to Plaintiff costs and disbursements related to this action, including

8 reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

9       I.      Granting such other and further relief as the Court deems just and proper.

10 **JURY DEMAND**

11    Shareholder hereby demands a trial by jury on all issues so triable.

12 August 3, 2018                   Respectfully submitted,

13                                 **BERMAN TABACCO**

14

15                             By:   */s/Daniel E. Barenbaum*

16                                  Daniel E. Barenbaum

17                           Nicole Lavallee

18                           44 Montgomery Street, Suite 650
San Francisco, CA 94104

19                           Telephone: (415) 433-3200
Facsimile:  (415) 433-6382

20                           Email: nlavallee@bermantabacco.com
             dbarenbaum@bermantabacco.com

21

22                           Leslie R. Stern
Nathaniel L. Orenstein

23                           **BERMAN TABACCO**

24                           One Liberty Square
Boston, MA 02109

25                           Telephone: (617) 542-8300
Facsimile: (617) 542-1194

26                           Email: lstern@bermantabacco.com
             norenstein@bermantabacco.com

27

28                           *Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          42

1

**<u>VERIFICATION</u>**

2      I, Chase Rankin, declare:

3      I am the Executive Director of the OKLAHOMA FIREFIGHTERS PENSION AND

4 RETIREMENT SYSTEM.  I make this verification in my capacity as Executive Director of the

5 OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM.  OKLAHOMA

6 FIREFIGHTERS PENSION AND RETIREMENT SYSTEM is a plaintiff in this action.

7 OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM has been a

8 shareholder of PG&E Corporation since at least July 31, 2015, through the wrongdoing

9 complained of herein, and has continuously held shares of PG&E Corporation stock since then.

10 I certify under penalty of perjury that I have read and reviewed the Verified Shareholder

11 Derivative Complaint and authorized its filing.  As to the allegations for which I have personal

12 knowledge, I know or believe such allegations to be true.  As to allegations for which I do not

13 have personal knowledge, based upon my and my counsel's investigation, such allegations are

14 true to the best of my knowledge, information, and belief.

15

16 Dated: August _l_, 2018            _____

17                               Chase Rankin

18                               *Executive Director of the Oklahoma Firefighters*
                              *Pension and Retirement System*

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT